Paul NATALE; Wendy Natale; Jarrod
Natale, Plaintiffs–Appellees,

v.

TOWN OF RIDGEFIELD; Ridgefield
Planning and Zoning Commission,
Defendants–Appellants.

Docket No. 97–7323.

United States Court of Appeals,
Second Circuit.

Argued Nov. 30, 1998.

Decided March 08, 1999.

Ralph G. Elliot, Tyler Cooper & Alcorn, Hartford, CT, for defendants–appellants.

David A. Reif, New Haven, CT (Donna Decker Morris, Susman, Duffy & Segaloff, New Haven, CT, on the brief), for plaintiffs–appellees.

Before: NEWMAN, LEVAL, and PARKER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal brings before us the recurring claim of a property owner alleging that the action of local officials in denying him permits has deprived him of his constitutionally protectable right not to be deprived of his property without due process of law. *See, e.g., Walz v. Town of Smithtown,* 46 F.3d 162 (2d Cir.1995); *RRI Realty Corp. v. Village of Southampton,* 870 F.2d 911 (2d Cir.1989); *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54 (2d Cir.1985). The defendants-appellants, the Town of Ridgefield ("Ridgefield") and the Ridgefield Planning and Zoning Commission ("the PZC") (together, "the Municipal Defendants"), appeal from the July 3, 1996, judgment of the District Court for the District of Connecticut (Thomas P. Smith, Magistrate Judge), entered after a jury verdict in favor of Paul Natale, his wife, and their son (together, "the Natales"), and related rulings. The jury found that the Municipal Defendants had violated the Natales' federally protectable property rights in the issuance of certain zoning and building permits by refusing to issue those permits in the absence of subdivision approval. The jury awarded the Natales $1,000,000 in damages for lost profits and emotional distress.

We conclude that the verdict must be set aside because the jury was not instructed that liability could be established only upon a finding that the Natales were deprived of any property interest they might have had in the permits by conduct that violated the substantive standards of the Due Process Clause, *i.e.,* conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority. We also conclude that retrial under proper instructions is not necessary because uncertainty as to the meaning of state law requirements precluded the Natales' claim to the permits from achieving the degree of certainty necessary to accord them constitutionally protectable property.

## Background

The controversy in this case stems from Natale's attempt to obtain certain zoning and building permits that were required before he could begin developing four abutting parcels of land in Ridgefield, Connecticut. Because controversies of this sort turn not only on the geographic landscape, but even more on the relevant local legal landscape, a federal court is obliged to examine carefully state and local regulations as well as court and administrative decisions.

Natale purchased four parcels of land in Ridgefield in 1986. Each parcel measures between one and one and a-half acres. Ridgefield's zoning regulations generally require residential building lots to be at least three acres. A property owner who intends to develop a residential lot of less than three acres normally must obtain subdivision approval from the PZC before Ridgefield will issue a zoning permit for the lot.

During the period when Natale sought the permits at issue in this case, the PZC maintained that his lots would constitute a subdivision under Ridgefield and Connecticut laws, requiring subdivision approval. Natale, on the other hand, maintained that the lots were not a subdivision because a map reflecting the four separate lots had been recorded with Ridgefield prior to the adoption of the subdivision regulation.

When the regulation requiring subdivision approval was adopted in 1959, it was accepted (and is not disputed on this appeal) that lots measuring less than three acres would be deemed validly subdivided if they had been recorded prior to the adoption of the regulation. In 1963, however, Ridgefield enacted a provision that seemed to repeal the grandfathering of lots on which construction had not yet begun. This "ungrandfathering"

drew support from a 1967 decision of the Connecticut Supreme Court construing the 1963 Ridgefield regulation. *See Sherman–Colonial Realty Corp. v. Goldsmith,* 155 Conn. 175, 183, 230 A.2d 568 (1967). *Sherman–Colonial* stated, "The mere filing of maps for the subdivision of a parcel of real estate does not necessarily immunize the subject property from the operative effect of *subsequent* subdivision regulations." *Id.* at 572 (emphasis added). In 1977, however, the state statutory definition of "subdivision" was amended to mean "the division of a tract or parcel of land ... made subsequent to the adoption of subdivision regulations by the [local planning and zoning] commission." Conn. Gen.Stat. Ann. § 8–18 (1989). The enactment of section 8–18 created uncertainty as to whether Natale's lots required local subdivision approval. The parties' opposing positions on this issue and the ultimate state court resolution of their dispute is considered below.

Natale's lots had been registered before 1959, when the subdivision regulation was adopted, but the previous owners did not begin construction prior to 1963.

Natale, a home builder, contracted to purchase the four lots for $200,000 in October 1985; title was transferred in June of 1986. Acting as an agent for the seller of the lots, a real estate broker applied in January 1986 for zoning variances for each of the lots. These applications sought variances from Ridgefield regulations governing setback distances and lot size and area. The Ridgefield Zoning Board of Appeals ("the ZBA") granted the variances on March 17, 1986. The ZBA's decision explicitly refers to the three-acre lot requirement and purports to grant a variance from it.

Unlike the ZBA, the PZC believed that Natale needed to obtain subdivision approval for his less–than–3–acre lots before the town could issue zoning and building permits for the lots. Despite its right to do so, the Commission did not appeal the ZBA's decision to grant the variances. Instead, the Commission, led by Katz, its chairman, convened in a closed session on March 18, 1986, and passed a resolution directing the town's Zoning Enforcement Officer not to issue zon-

ing permits despite the variances granted by the ZBA. The minutes of the Commission's meeting reflect that this action was taken because the Commission believed the lots required subdivision approval. As a result, the Zoning Enforcement Officer, Thomas Bogardus, denied Natale's application for a zoning permit for Lot 95, citing the minutes of the PZC's March 18th meeting.

Nevertheless, Natale began the process of obtaining a building permit for Lot 95. Both a zoning and a building permit are required to begin development. With some difficulty, Natale obtained several of the various other permits necessary to the grant of a building permit. However, the zoning permit denied by the PZC was also a prerequisite to the grant of a building permit, and the PZC continued to direct Bogardus, the Zoning Enforcement Officer, not to grant the zoning permit. Natale then filed a lawsuit on June 18, 1986, against the Commission and Bogardus in the Connecticut Superior Court, seeking a writ of mandamus to compel the issuance of zoning permits for the four lots. On the day a hearing for a temporary injunction was scheduled, the PZC agreed to "honor[ ] any variances granted by [the ZBA]" and grant a zoning permit for Lot 95 (the only lot for which Natale had sought a permit at this time) as soon as all zoning requirements were met. A zoning permit was granted eight days later.

Further complications ensued. Under Ridgefield zoning law, construction must begin within three months of the issuance of a zoning permit and be completed within a year. In order to begin construction, however, Natale needed a building permit. Since his initial legal skirmish with the PZC had proved successful and the zoning permit had been issued, Natale applied for a building permit, expecting routine review and approval of his application. However, on August 6th (two days after the temporary injunction hearing date where the PZC had agreed to honor the variances granted by the ZBA), the Chairman of the PZC wrote a letter to James McManus, the Building Inspector, with a copy to McManus's superior, the First Selectman, "appris[ing]" McManus that although the zoning permit had been issued for

Lot 95, a building permit should not be issued "as it is not an approved lot" and no application for subdivision approval had been filed. The First Selectman directed McManus not to issue the permit.

McManus's decision to deny Natale's application for a building permit was communicated to him orally and then by letter dated August 22, 1986. That letter reads:

> The Building Department has received your permit application for a building permit. The application is complete and contains the information required by the State Building Code. The permit has been approved to be issued by the Building Department according to the State Statutes.
>
> The First Selectman and Town Counsel has [sic] requested the Building Department to delay the issuance of the building permit at this time.

Natale returned to the Superior Court, adding McManus as an additional defendant in his action and amending his complaint to seek a mandamus to compel issuance of the building permit. In this litigation, the two sides presented their competing views on the ambiguity, created by the 1977 enactment of section 8–18, as to whether Natale's lots required subdivision approval. The PZC's position was that *Sherman–Colonial* had recognized the force of Ridgefield's "ungrandfathering" of the Natale lots, thereby leaving the lots in need of subdivision approval, which had never been validly obtained following adoption of the original 1959 Ridgefield regulations. Natale's position was that since section 8–18 defined "subdivision" to mean a division made *subsequent* to local subdivision regulations and since his lots had been recognized as subdivided *before* the original 1959 Ridgefield regulations, the 1977 statute, in effect, recognized that no further subdivision approval was necessary.

Approximately one year later, on August 27, 1987, the Superior Court held that the Natale properties did not constitute a subdivision and that subdivision approval was therefore not required. *See Natale v. Bogardus*, No. 86–0289–41 (Conn.Super.Ct. Aug. 28, 1987). The Court reasoned that the PZC's reliance on *Sherman–Colonial* was unavailing because that decision had been based on the 1967 state law definition of "subdivision," which had been replaced in 1977 by section 8–18. In the Superior Court's view, section 8–18's definition of "subdivision" "exclude[d] divisions of property made prior to the adoption of subdivision regulations" and, therefore, "divisions of property made before the adoption of subdivision regulations were not 'subdivisions' as defined by Section 8–18." *Id.* Memorandum of Decision at 6. The Court did not explicitly discuss Ridgefield's "ungrandfathering" regulation, but implicitly held that it was, in effect, displaced by section 8–18's definition of "subdivision," which protected Natale's lots against "ungrandfathering."

The Court issued a writ of mandamus requiring issuance of zoning and building permits for Lot 95, but denied Natale's request for a mandamus requiring permits for the remaining lots because he had not yet applied for permits for those lots. In considering Natale's request for a writ of mandamus, the Court ruled that Natale "ha[d] a clear right" to the issuance of the building and zoning permits and that the defendants "ha[d] no discretion with respect to [the issuance of the permits because] the technical requirements for the permits had been met." *Id.* at 7–8. The decision was not appealed by the defendants, and a building permit was issued on September 10, 1987.

Natale began construction on Lot 95 in the fall of 1987, but, as a result of a decline in real estate values, made less profit than he had anticipated.

Natale commenced this action in June 1988, seeking recovery under 42 U.S.C. § 1983 for the violation of a federally protectable property right in the issuance of the zoning and building permits. The suit was originally brought against the Municipal Defendants and Katz, personally and in his capacity as Chairman of the PZC. On a prior appeal, we reversed the District Court's ruling on Katz's qualified immunity defense, ruling that because of the ambiguity created by the *Sherman–Colonial* decision, "[a]t the time the Natales applied for the zoning permit, Katz had a reasonable belief that their

land was not properly subdivided, giving the Town the discretion to deny their application." *Natale v. Town of Ridgefield,* 927 F.2d 101, 105 (2d Cir. 1991) (*Natale I*).

The case against the Municipal Defendants was tried before Magistrate Judge Smith and a jury in June 1996. The Natales sought money damages for lost profits and emotional distress.

The jury found in favor of the Natales and awarded them a total of $1,000,000.

## Discussion

### I.  Defect in the Jury Charge

■ The case was presented to the jury on the theory that all the Natales needed to prove was entitlement to their permits as a matter of state law and denial of the permits by the Municipal Defendants. Whether or not proof of such elements could entitle the Natales to damages in state court on some state law cause of action, such proof does not support a judgment based on a federal claim of denial of property without due process of law. The federal claim is based on the Fourteenth Amendment, as implemented by section 1983, and requires the existence of a federally protectable property right and the denial of such a right in the absence of either procedural or substantive due process. We will defer consideration of the property right issue, and focus at this point on whether the jury was properly instructed as to the standard for a due process violation.

■ Since there is no claim that the Municipal Defendants acted without according the Natales procedural due process (and no such claim would be viable since all denials were preceded by notice and hearing and followed by written explanations), the claim of violation must be for a denial of substantive due process. Contrary to the Natales' implicit premise, such a claim is not established simply by proving that someone did not obtain what he or she is entitled to under state law. For state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels "arbitrary" and "outrageous." *See, e.g., County of Sacramento v. Lewis,* 523 U.S.

833, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998)("[T]he touchstone of due process is protection of the individual against arbitrary action of government.") (citation and internal quotation marks omitted); *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (conduct that "shocks the conscience" violates substantive due process), *overruled on other grounds by Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *cf.  Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (observing that persons have the "right to be free of arbitrary or irrational zoning actions"); *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1221–22 (6th Cir.1992) ("To prevail, a plaintiff must show that the state administrative agency has been guilty of arbitrary and capricious action in the strict sense, meaning that there is no rational basis for the ... decision.") (citation and internal quotation marks omitted).

Arbitrary conduct that might violate zoning regulations as a matter of state law is not sufficient to demonstrate conduct so outrageously arbitrary as to constitute a gross abuse of governmental authority that will offend the substantive component of the Due Process Clause. *See RRI,* 870 F.2d at 914 n. 1; *Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1034 (3d Cir.1987); *Shelton v. City of College Station,* 780 F.2d 475, 482–83 (5th Cir.1986) (in banc). As the First Circuit has observed in rejecting a due process claim where a planning board interpreted state subdivision laws and a state court decision in ways that frustrated the plaintiffs' development plans,

> the conventional planning dispute—at least when not tainted with fundamental procedural irregularity, racial animus, or the like—which takes places within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution. This would be true were planning officials to clearly violate, much less "distort" the state scheme under which they operate.

*Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 832–33 (1st Cir.1982).

Substantive due process is an outer limit on the legitimacy of governmental action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority. *See, e.g., Lewis,* 118 S.Ct. at 1716 ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense.") (citation and internal quotation marks omitted); *Silverman v. Barry,* 845 F.2d 1072, 1080 (D.C.Cir.1988) ("Only a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983.") (citation omitted).

The Court was thus obligated to charge the jury to the effect that the plaintiffs could not prevail unless the jury was persuaded that the conduct of the defendants in denying the permits was so outrageously arbitrary as to constitute a gross abuse of governmental authority. The Municipal Defendants requested essentially such a charge, and the Court, with the Natales' encouragement, declined to give it. Instead, the Court charged the jury that the Natales could prevail if they were entitled to the permits under Connecticut law. The charge was deficient in failing to instruct the jury on the relevant constitutional standard.

II. Existence of a Federally Protectable Property Right

Though the error in the jury instruction requires invalidation of the judgment, retrial is not necessary in this case because, as a matter of law, Natale does not have a federally protectable property right in the permits for which he applied.

Before a plaintiff seeks to prove that a state official's denial of a permit deprived him of a property right in the permit

in violation of the standards of substantive due process, as explicated above, he must first establish that he has a federally protectable property right in the permit. This requires a demonstration that he had a clear entitlement to the permit under state law. *See Walz,* 46 F.3d at 167–68; *RRI Realty,* 870 F.2d at 917–18; *Yale Auto Parts,* 758 F.2d at 58–59. Usually, entitlement turns on whether the issuing authority lacks discretion to deny the permit, *i.e.,* is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met. There is no reason, however, to restrict the "uncertainty" that will preclude existence of a federally protectable property interest to the uncertainty that inheres in an exercise of discretion. Uncertainty as to the meaning of applicable law also suffices.[1] Indeed, if uncertainty as to the law did not preclude recognition of a federally protectable property interest, permit claimants would regularly be entitled to present to federal courts their disputes concerning the interpretation of local and state land use regulations. Just as federal courts are not to be turned into zoning boards of appeals, *see Village of Belle Terre v. Boraas,* 416 U.S. 1, 13, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (Marshall, J. dissenting), they are also not to be substituted for state courts as adjudicators of the meaning of zoning and other land use regulations, *see RRI Realty,* 870 F.2d at 918 ("If federal courts are not to . . . substitute for state courts in their state law review of land-use regulatory decisions[ ], the entitlement test of *Yale Auto Parts* . . . must be applied with considerable rigor."). In almost all cases, the existence of a federally protectable property right is an issue of law for the court. *See id.* Since the existence of such a right in this case does not turn on any disputed facts, it was error to submit the property right issue to the jury.

In this case, Natale's entitlement to the permits he sought turned ultimately on the resolution of the parties' state law dispute as to whether Natale had grandfathered subdivision rights. That issue turned on the

---

1. Thus, in order to establish a federally protectable property interest in a state or local permit for which a plaintiff has applied, the plaintiff must show that, at the time the permit was denied,

there was no uncertainty regarding his entitlement to it under applicable state or local law, and the issuing authority had no discretion to withhold it in his particular case.

**264**

meaning of section 8–18 and an interpretation of the state court decision in *Sherman–Colonial.* As we noted in *Natale I,* the meaning and effect of the decision in *Sherman–Colonial* "was a legitimate dispute." 927 F.2d at 105. That dispute was resolved by the state court in favor of Natale, *see Natale v. Bogardus, supra,* and the last permit that Natale had sought was issued promptly thereafter. Though the state court that finally determined that new subdivision approval was not required for Lot 95 (the only one for which permits had been applied) issued a writ of mandamus, its conclusion that Natale's right was sufficiently clear to warrant mandamus relief as a matter of state law does not establish that Natale's entitlement to permits was so clear as to accord him a federally protectable property right in those permits. The state court issued mandamus only after it made a refined analysis of two state statutes and a state Supreme Court decision, thereby resolving an issue that had previously been "a legitimate dispute."

The Municipal Defendants contend that our recognition of qualified immunity for the chairman of the PZC in *Natale I* necessarily means that Natale lacked a federally protectable property right. As they point out, our prior decision noted the legal uncertainty as to whether the permit applications should have been granted, *see* 927 F.2d at 105, and concluded that, in light of this uncertainty, the PZC chairman "could reasonably assume that the Commission could require the Natales to obtain subdivision approval before the requested permits were issued," *id.* That same legal uncertainty, the defendants contend, defeats the Natales' claim to a federally protectable property interest in the permits.

Though "uncertainty" as to an officer's legal obligation to issue permits, for purposes of qualified immunity, is not necessarily identical to "uncertainty" as to an applicant's entitlement to permits, for purposes of a federally protectable property interest in the permits, the dispute as to the meaning of state and local law in this case was sufficiently in doubt both to support qualified immunity and to defeat the existence of a federally protectable property right.

In light of this conclusion, we need not consider the Municipal Defendants' additional challenges to the judgment.

### Conclusion

The judgment of the District Court is reversed, and the case is remanded with directions to enter judgment for the defendants-appellants. No costs.