Randall J. PALMER, Plaintiff,

v.

**CITY OF SARATOGA SPRINGS &
City of Saratoga Springs Planning
Board, Defendants.**

No. 1:99–CV–1091(NAM)

United States District Court,
N.D. New York.

Nov. 29, 2001.

Hinman, Howard & Kattell, LLP (Albert J. Millus, Jr., of counsel), Binghamton, NY, for Plaintiff.

Donohue, Sabo, Varley & Armstrong, P.C. (Kenneth G. Varley, of counsel), Albany, NY, for Defendants.

## MEMORANDUM—DECISION AND ORDER

MORDUE, District Judge.

In this case, plaintiff Randall J. Palmer, a licensed amateur radio operator, challenges defendant City of Saratoga Springs Planning Board's decision denying his application for a special use permit to erect a 47–foot radio antenna tower in his backyard. Palmer principally argues that the Planning Board's denial of his special use permit application contravenes a Federal Communications Commission (FCC) regu-

lation known as "PRB–1."[1] Palmer also asserts a 42 U.S.C. § 1983 claim premised upon the denial of procedural and substantive due process as guaranteed by the Fifth and Fourteenth Amendments, a 42 U.S.C. § 1988 claim for attorneys' fees, and a pendent state law claim pursuant to Article 78 of the New York Civil Practice Law and Rules.

For the reasons stated below, the Court agrees with Palmer that the Planning Board failed to reasonably accommodate his amateur communication needs in accordance with PRB–1. The Court rejects Palmer's section 1983 and 1988 claims, and dismisses his Article 78 claim as moot. Pursuant to Fed.R.Civ.P. 52, the following constitutes this Court's findings of fact and conclusions of law.

## BACKGROUND

Palmer currently holds an "Extra" class license—the highest class license attainable from the FCC. Prior to moving to Saratoga Springs, Palmer lived in Ballston Spa where he had a 60–foot radio antenna in his backyard. During this time, Palmer and his radio antenna enjoyed a peaceful coexistence with his Ballston Spa neighbors.

In 1998, Palmer moved into his current residence. Rather than erect his old 60–foot tower, which required guy wires for support, Palmer instead planned to erect a "free-standing crank-up-tower." Palmer's new tower would be assembled with tele-

scoping sections and could be lowered or raised as needed. The proposed tower, however, exceeded the maximum height allowance under section 24–12.15 of the City of Saratoga Springs Zoning Ordinance and thus required Palmer to apply for a special use permit.[2]

On January 4, 1999, Palmer applied to the Planning Board for a special use permit to construct a 41–foot amateur radio tower with two antennas on top, for an overall height of 47–feet (*see* Pl's Exh 4). In his application, Palmer explained that at 41–feet, "the chance of local residences receiving unwanted transmissions is nil, and the chances for successful transmission and reception of signals by the Amateur radio station are greatly improved" (*id.*).

The Planning Board held hearings on Palmer's application on February 3, 1999, March 3, 1999, and May 19, 1999. Some neighborhood opposition undisputedly existed with respect to Palmer's application. On June 16, 1999, the Planning Board unanimously denied Palmer's application (*see* Planning Board Meeting Minutes, 6–16–99, Pl's Exh 77). Citing Section 240–6.4 of the City's Zoning Ordinance, the Planning Board determined that Palmer's proposed use failed to meet the following special use standards:

> #3: That the public health, safety, welfare or order of the City will not be adversely affected by the proposed use in its location.

1. On September 19, 1985, the FCC issued *In re Federal Preemption of State and Local Regulations Pertaining to Amateur Radio Facilities*, 101 F.C.C.2d 952, 50 Fed.Reg. 38, 813 (1985) (codified at 47 CFR § 97.15(e) (2000)). For convenience, the Court refers to this ruling as PRB–1.

2. Section 240–12.15 states in relevant part that while individual antennas are permitted as accessory uses in any zoning district, "[n]o

such antenna ... shall exceed, in any dimension, twenty (20) feet in height, width or depth," City of Saratoga Springs, N.Y., Zoning Ordinance, Article XII, § 240–12.15(1)(a) (Amended June 6, 1994). Additionally, Section 240–12.15 provides that all antennas "not permitted by subsection (A) above shall be permitted upon the issuance of a special use permit by the Planning Board." *Id.* § 240–12.15(B)(1).

# 6: That the [sic] conservation of the property values and the encouragement of the most appropriate use of the land.

# 12: That the proposed use will not interfere with the preservation of the general character of neighborhood in which such building is to be placed or such use is to [sic] conducted.

# 17: Whether the proposed special use provides landscaping and/or other forms of buffeting to protect surrounding land uses.

(*Id.*). In support of its decision, the Planning Board made the following findings of fact: (1) that Palmer's special use permit application was to construct a single tower housing two antennas, the top antenna measuring 47 feet above the existing grade level (when extended), and measuring 14 feet wide by 24 feet long, and the bottom antenna resting 41 feet high, and measuring 14 feet wide and 31.5 feet long; (2) that the Planning Board was aware of PRB-1 and the obligation to reasonably accommodate the interests of licensed amateur radio operators to conduct communications; (3) that the height of the proposed tower and antenna was not in scale with the other man-made features in the neighborhood and was inconsistent with the character of the neighborhood, and (4) that Palmer failed to provide the Planning Board with (a) a visual representation of the proposed tower and the antenna system, (b) any documentation to support the claim that the antenna and tower system would not adversely impact the surrounding the properties, and (c) a definitive response as to whether he would consider vegetative screening to mitigate the visual impact of the tower and antenna system (*see id.*). That same day, the Planning Board issued a written decision memorializing its denial of Palmer's application for a special use permit (*see* Resolution of Special Use Permit, 6–16–99, Pl's Exh 35).

Shortly thereafter, Palmer instituted this action alleging, among other things, that the Planning Board's denial of his special use permit application contravened PRB–1. After some negotiation between the parties, the Planning Board agreed to reconsider Palmer's application for a special use permit if he submitted certain additional information. Specifically, the Planning Board requested that Palmer (1) submit four separate proposals for placement of the tower and antenna, (2) pay staff fees for review of the new material and the costs associated with a newspaper hearing notice and mailings to notify nearby property owners of the new hearing, (3) identify any television, radio or telephone interference problems that may be caused by the proposed tower and antenna, (4) provide information of the effect, if any, the tower may have on property values, and (5) provide proof of liability insurance "that covers any damage caused by the antennae" (*see* Tharpe Ltr, 8–9–2000, Pl's Exh 38).

In response, Palmer's counsel submitted to the Planning Board (1) four alternative proposals, complete with plot plans and photographs, (2) a request for the amount of fees due, (3) a study commissioned by the American Radio Relay League concluding that the presence of amateur radio towers has no adverse effect on property values, and (4) proof of liability insurance (*see* Millus Ltr, 8–19–00, Pl's Exh 39). With respect to the issue of interference, Palmer's counsel indicated to the Planning Board that federal law preempts municipalities from denying a permit for an amateur radio tower based on interference concerns and that, in any event, the sophistication of Palmer's equipment virtually ensured that no interference would result from his use of the tower and antenna (*see id.*).

Palmer also agreed to (1) purchase a new antenna for $650 as a substitute for the two proposed antennas—lowering the proposed height of the tower and antenna by three feet, (2) retract the antenna when not in use, (3) install a fence around the tower, and (4) install screening around the tower and paint the tower to minimize its visual impact on the neighborhood (*see* Millus Ltr, 7–25–00, Pl's Exh 37).

Subsequently, the Planning Board held additional hearings on the application on September 14, 2000 and January 17, 2001. At the January 17th meeting, Palmer and the Planning Board discussed two proposals regarding the vegetative screening Palmer had agreed to place around the antenna tower in order to minimize its visual effect. The first proposal consisted of planting nine trees at a cost of $4,585, and the second proposal consisted of planting four trees at a cost of $1,160 (*see* Planning Board Minutes, 1–17–01, Pl's Exh 62). Palmer rejected the first screening proposal based on its cost, but agreed to the second proposal (*see id.*). In addition, Palmer rejected the Planning Board's suggestion that he only operate his radio at night, indicating that the bands he operates on are generally only available during the day and such a restriction would severely curtail his ability to communicate on the weekends—the time when he most frequently operated his radio.

On February 7, 2001, the Planning Board denied Palmer's application by a 5–2 vote (*see* Resolution of Special Permit, 2–17–01, Pl's Exh 66). The Planning Board cited the following reasons for denying the application:

1. The Board[,] excepting for the intrusion of the FCC regulations on local police power[,] would not consider this project acceptable on this specific site because of the site's small size, high visibility within the neighborhood and close proximity of neighboring residences.

2. The proposed antenna has a significant adverse visual impact. This adverse impact is local in character, affecting the immediate neighborhood and users of the local street system. These impacts will only cease when the antenna is removed at some undefined future date. The applicant's own proof (sketches and photographs) illustrated that the antenna would impair the neighborhood character and visual environment.

3. The applicant was requested to supply the Board with objective technical expertise, but only provided presentations from obviously interested parties.

4. The proposed antenna will interfere with the use and enjoyment of both the general public (viewed from the public street) and local residents/neighbors (from their homes and yards) in this serene and established neighborhood.

5. The applicant told the Board that he would not accept a mitigating measure proposed by the Board to limit the hours of broadcasting to non-daylight hours.

6. The applicant has offered only marginal mitigation to screen the view of the antenna. The applicant offered less screen planting than necessary to appropriately screen the tower and antenna in its retracted position. The applicant has not offered any plant buffer to screen the tower and antenna from the street, even though that form of mitigation (screening) is feasible.

7. The applicant offered inadequate proof that the proposed fencing at

the base of the tower would adequately restrain or eliminate the possibility of neighborhood children and pets from accessing this attractive nuisance.

8. The applicant offered inadequate proof that the tower and antenna can be operated at a safe manner when lowering and raising the device.

9. The applicant's plan to retract the antenna when not in use, places unnecessary burden on the neighbors to enforce.

10. The applicant violated the spirit of the FCC regulations by failing to accept mitigation options (such as adequate vegetative screening and limited hours of tower extension to nighttime use) suggested and recommended by the Board in an effort to maintain the existing character of the neighborhood. The Board has made every effort to follow the directive of memorandum PRB–1 and address suitable mitigation measures with the applicant. That applicant has, however, refused to clearly state his acceptance of all such mitigation measures. The applicant failed to supply the necessary requested, detailed, objective and convincing documentation to support a favorable vote on this application. The applicant failed to mitigate the adverse impacts to the maximum extent practicable. The applicant failed to establish or propose reasonable balancing offsets that might acceptably mitigate the adverse impacts.

11. The applicant failed to meet the legislatively imposed threshold standards as set forth in the Zoning Ordinance for the issuance of a special use permit

(*id.*)

After receiving the Planning Board's decision denying his application, Palmer proceeded with this lawsuit. In addition to alleging that the Planning Board's decision is preempted by PRB–1, Palmer asserts a 42 U.S.C. § 1983 claim alleging that the Planning Board's initial June 16, 1999 determination deprived him of his procedural and substantive due process rights guaranteed under the Fifth and Fourteenth Amendments. Palmer also claims the decision is arbitrary and capricious and must be annulled pursuant to Article 78 of the New York Civil Practice Law and Rules. The complaint seeks declaratory and injunctive relief allowing Palmer to erect the proposed antenna configuration, as well as unspecified damages and attorneys' fees.

A bench trial was held on October 30, 2001 and, at the close of proof, the court reserved decision.

## DISCUSSION

### 1. Palmer's PRB–1 Claim

■ Undeniable tension exists between amateur radio operators' interests in erecting a radio antenna high enough to ensure successful communications, and local municipalities' interests in regulating the size and placement of amateur radio antennas. Choosing between the two, the federal government aligned its interests with those of the amateurs because "amateur radio volunteers afford reliable emergency preparedness, national security, and disaster relief communications," and because a direct correlation exists between antenna heights and amateurs' ability to successfully transmit and receive radio signals. *Pentel v. City of Mendota Heights,* 13 F.3d 1261, 1263 (8th Cir.1994). Accordingly, "federal interests are furthered when local

regulations do not unduly restrict the erection of amateur radio antennas." *Id.*

Weighing the various local, federal and amateur interests, the FCC issued PRB-1 in an attempt to "referee" the tension between the competing interests and "strike a balance between the federal interest in promoting amateur communications and the legitimate interests of local governments in regulating local zoning matters." *Id.* (quoting PRB-1 ¶¶ 22, 24). In issuing PRB-1, the FCC declared a "limited preemption of state and local regulations which preclude amateur communications," and stated in relevant part that:

> Because amateur station communications are only as effective as the antennas employed, antenna height restrictions directly affect the effectiveness of amateur communications. Some amateur antenna configurations require more substantial installations than others if they are to provide the amateur operator with the communications that he/she desires to engage in.... We will not, however specify any particular height limitations below which a local government may not regulate, nor will we suggest the precise language that must be contained in local ordinances, such as mechanisms for special exceptions, variances, or conditional use permits. Nevertheless, **local regulations which involve placement, screening, or height of antennas based on health, safety, or aesthetic considerations must be crafted to [reasonably accommodate] amateur communications, and to represent the minimum practicable regulation to accomplish the local authority's legitimate purpose.**

PRB-1 Summary & ¶ 25 (emphasis added).

Although the Second Circuit has not yet considered the validity of PRB-1's limited preemptive effect on local regulations, other federal courts have held upheld its preemptive effect. *See, e.g., Pentel,* 13 F.3d at 1263; *Evans v. Board of County Comm'rs of County of Boulder, Co.,* 994 F.2d 755, 760-61 (10th Cir.1993); *Thernes v. City of Lakeside Park,* 779 F.2d 1187, 1188-89 (6th Cir.1986) (per curiam); *Bodony v. Incorporated Village of Sands Point,* 681 F.Supp. 1009, 1011-12 (E.D.N.Y.1987).

There are two ways PRB-1 may preempt a local ordinance. First, a local regulation "may be preempted on its face." *Pentel,* 13 F.3d at 1263. For instance, a city's zoning ordinance that banned or imposed an unvarying height restriction on amateur radio antennas would be facially invalid in light of PRB-1. *See id.* (citing *Evans v. Board of County Comm'rs of County of Boulder, Co.,* 752 F.Supp. 973, 976-77 (D.Colo.1990); and *Bulchis v. City of Edmonds,* 671 F.Supp. 1270, 1274 (W.D.Wash.1987)). Here, section 24-12.15 of the City of Saratoga Springs Zoning Ordinance is not facially preempted by PRB-1 because it neither bans nor imposes an unvarying height restriction on amateur radio antennas. While the ordinance does restrict antennas to 20 feet in height, width or depth, the statute provides that antennas that exceed those dimensions are permitted upon issuance of special use permit.

Second, PRB-1 preempts a local regulation where a city fails to *apply* a local ordinance in a manner which reasonably accommodates amateur communications. *See Pentel,* 13 F.3d at 1263-64 (emphasis added) (citations omitted). Accordingly, "a local regulation that impairs amateur radio communications is preempted as applied if the city has not crafted it to accommodate reasonably amateur communications while using the minimum practicable regulation [necessary] to accomplish the local authority's legitimate purpose." *Id.* (internal quotation marks and citation omitted).

On this ground, Palmer argues that section 24–12.15 of the City of Saratoga Springs Zoning Ordinance is preempted as applied because the Planning Board's decision denying his application for a special use permit failed to reasonably accommodate his amateur radio communication needs. The Planning Board contends that its denial of Palmer's application is not preempted as applied because it fully considered it obligations under PRB–1, explored alternatives with Palmer, and "attempted to accommodate the applicant consistent with its own obligation to protect the character of the neighborhood" (Def's Trial Mem of Law, Dkt. No. 20, at 14).

Although PRB–1 clearly requires a city to accommodate amateur communications, an amateur radio operator clearly has no right to build any antenna he or she chooses. Scant case law exists, however, to define the parameters of how "accommodating" a municipality must be to amateur radio needs. Courts have held that the PRB–1 reasonable accommodation standard requires a municipality to (1) consider the application, (2) make factual findings, and (3) attempt to negotiate a satisfactory compromise with the applicant. *See Pentel,* 13 F.3d at 1264 (quoting *Howard v. City of Burlingame,* 937 F.2d 1376, 1380 (9th Cir.1991)).

Here, the Planning Board satisfied the first two prongs of the reasonable accommodation test: It conducted numerous hearings over a protracted period of time—February 3, 1999 through February 7, 2001—in consideration of Palmer's application, and it also made factual findings in its written decisions. However, the record here clearly proves that the Planning Board did not attempt to negotiate a satisfactory compromise with Palmer.

On the surface, it might appear that the Planning Board and Palmer engaged in negotiation, i.e., that there was some "give and take" between the parties. But a closer look reveals that the Planning Board never tried to work out a *satisfactory* compromise with Palmer. Rather, the Planning Board engaged Palmer in a strictly one-sided negotiation consisting of inflexible demands and the construction of hoop after hoop for Palmer to jump through.

Palmer submitted undisputed and voluminous materials to the Planning Board demonstrating that a 47–foot antenna was the minimum height needed for effective communication. And after the Planning Board agreed to rehear his application, Palmer promptly complied with the Planning Board's numerous requests, supplying (1) four separate proposals for placement of the tower and antenna, (2) information on the effect the tower may have on property values, and (3) proof of liability insurance, among many other things. Moreover, Palmer, acting on his own initiative, agreed to (1) lower the antenna when not in use, (2) buy a $650 new antenna which would lower the overall height of the structure, and (3) paint the tower and install a fence and vegetative screening around it to minimize any visual impact.

The few Planning Board requests that Palmer refused to agree to were unreasonable on their face. For instance, Palmer refused to only operate his antenna at night because the 20 through 10 meter bands he communicated on were virtually useless after dark. Likewise Palmer refused to spend roughly $4500 on vegetative screening when $1100 worth of trees would satisfy this demand. Lastly, Palmer refused to give the Planning Board any additional information on the issue of interference for the simple reason that the issue of possible interference was beyond the Board's purview. Nonetheless, Palmer's

assurance to the Planning Board that his state-of-the-art equipment virtually eliminated the issue of interference fell on deaf ears.

The Planning Board's written decision underscores its inflexibility in dealing with Palmer, and further highlights its failure to attempt a satisfactory negotiation. In addition to relying on Palmer's failure to comply with the Planning Board's various mitigation requests—i.e., the unreasonable vegetative screening and "nighttime only use" requests—the written decision also cites three other untenable grounds justifying the denial. First, the Planning Board faults Palmer for not proving that the fence he agreed to erect around the tower would "adequately" keep children and neighborhood pets from accessing the antenna tower. Second, the Planning Board indicates that Palmer failed to prove that the antenna tower can be operated in a safe manner. These first two grounds not only place upon Palmer the unfair task of debunking the Planning Board's groundless assumptions, but the record indicates the Planning Board never even asked him to address these specific issues. Last, and perhaps most indicative of the Planning Board's rigidity to negotiation, the written decision states that while Palmer agreed to lower the antenna when not in use, that agreement places an "unnecessary burden" on his neighbors to enforce. The Planning Board's reliance on this ground is obviously indefensible and yet another "stretch" to deny Palmer his right to reasonable accommodation.

For the above reasons, this Court concludes that the Planning Board did not attempt to negotiate a satisfactory compromise with Palmer and, thus, failed to reasonably accommodate his amateur communication needs pursuant to PRB-1. Accordingly, the Court declares section 24-12.15 of the City of Saratoga Springs Zoning Ordinance preempted as applied to Palmer. Normally, the Court would simply instruct the Planning Board to comply with PRB-1. However, given that the Planning Board was already fully apprised of its duties under PRB-1 when it reconsidered Palmer's application, such action would likely be futile. The Court thus enjoins the Planning Board from taking further action interfering with Palmer's special use permit application and orders the Planning Board to grant the application with the conditions already agreed to by Palmer.

## 2. Palmer's Other Claims

■ Palmer cursorily argues that the Planning Board's initial June 16, 1999 decision denying his special use permit application violated both his procedural and substantive due process rights. As a threshold issue, a plaintiff asserting either a procedural or substantive due process violation must demonstrate the existence of a federally protected property right. See Natale v. Town of Ridgefield, 170 F.3d 258, 262 (2d Cir.1999). Assuming without deciding that Palmer's entitlement to reasonable accommodation under PRB-1 amounts to a federally protected property right, this Court concludes that Palmer did not suffer any due process deprivation.

Generally speaking, a plaintiff's procedural due process rights are satisfied when a municipality's decision denying a request is preceded by notice and a hearing, and followed by a written explanation. See Vertical Broad., Inc. v. Town of Southampton, 84 F.Supp.2d 379, 391 (E.D.N.Y. 2000) (citing Natale v. Town of Ridgefield, 170 F.3d at 262). Substantive due process, on the other hand, demarcates "an outer limit on the legitimacy of governmental action," Natale, 170 F.3d at 263, and substantive due process rights are violated by "conduct that is so outrageously arbitrary

as to constitute a gross abuse of governmental authority." *Id.* (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998))

With respect to his procedural due process claim, the record is clear that Palmer received adequate notice, and the Planning Board held numerous hearings on his application. Additionally, the Planning Board backed its decision denying the special use application with a written explanation. Palmer thus received sufficient procedural process.

■ Turning to Palmer's substantive due process claim, the Court finds it similarly weak. Here, the Planning Board failed to negotiate with Palmer in order to reach a satisfactory compromise, but its conduct—although not in line with PRB-1—falls far short of being "outrageously arbitrary" constituting a "gross abuse of governmental authority." *Natale,* 170 F.3d at 263. Accordingly, Palmer fails to prove either a procedural or substantive due process claim and these claims, as well as his 42 U.S.C. § 1988 claim for attorneys' fees, are dismissed.

Because the relief Palmer's seeks in his pendent state law claim is identical to the relief granted on his PRB-1 claim, the Court dismisses the Article 78 claim as moot. Additionally, Palmer offered no specific evidence to support any award of damages in this case.

### CONCLUSION

After conducting a bench trial on October 30, 2001, and after carefully reviewing the parties' submissions and considering all the evidence, it is:

**DECLARED** that section 24-12.15 of the City of Saratoga Springs Zoning Ordinance is preempted as applied to Palmer's special use permit application because the Planning Board failed to reasonably accommodate his amateur communication needs pursuant to PRB-1, and it is further;

**ORDERED** that the Planning Board grant Palmer's special use permit application to erect a 47-foot antenna with the conditions already agreed to by Palmer, and it is further;

**ORDERED** that Palmer's 42 U.S.C. § 1983 claim is **DISMISSED** because insufficient evidence exists that either his procedural or substantive due process were violated, and it is further;

**ORDERED** that Palmer's 42 U.S.C. § 1988 claim for attorneys' fees is **DISMISSED,** and it is further;

**ORDERED** that Palmer's pendent Article 78 claim is **DISMISSED** as moot.

**ORDERED** that judgment be entered pursuant to Fed.R.Civ.P. 58.

**IT IS SO ORDERED.**