Victoria M. LELAND, Roy R. Leland, and Maxine Chapin, Plaintiffs,

v.

Marc MORAN, Alan Fuchs, Albert Klauss, David G. Pollock, the Town of Warwarsing, Gerald Depew, Joseph Stoeckler, John Kissell, the Village of Ellenville, Raymond Younger, Michael Mills, Joseph Straub, and the Village of Ellenville Police Department, Defendants.

No. 99–CV–1449.

United States District Court, N.D. New York.

Dec. 16, 2002.

Thornton, Bergstein & Ullrich, LLP (Scott A. Thornton, Esq., of counsel), Chester, NY, for Plaintiffs.

Carter, Conboy, Case, Blackmore, Maloney & Laird, PC (Kimberly Boucher Furnish, Esq., of counsel), Albany, NY, for Defendants Village of Ellenville, Raymond Younger, Michael Mills and Joseph Straub.

Kalter Kaplan & Zeiger (Ivan Kalter, Esq., of counsel), Woodburne, NY, for Defendants Town of Warwarsing, Gerald Depew, Joseph Stoeckler, and John Kissell.

Eliot Spitzer, Attorney General of the State of New York (Joseph Koczaja, Esq., Asst. Attorney General, Of Counsel), Albany, NY, for Defendants Marc Moran, Alan Fuchs, Albert Klauss, and David Pollock.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiffs Victoria Leland, Roy Leland, and Maxine Chapin ("plaintiffs") com-

menced the instant action against defendants claiming violations of their rights under the Fourteenth Amendment to the United States Constitution, and negligence. Plaintiffs contend that defendants' failure to enforce various laws to remedy certain environmental conditions were negligent and deprived them of their constitutionally protected rights. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiffs oppose.

Oral argument was heard on September 27, 2002 in Albany, New York. Decision was reserved.

## II. FACTS

### A. The Parties

Plaintiffs own property in the Village of Ellenville, New York. (Defs.' Joint Rule 7.1 Stmnt at ¶¶ 6, 10.)[1] The Village of Ellenville ("Village" or "Ellenville") is located within the Town of Warwarsing ("Town" or "Warwarsing") in Ulster County, New York. The Ellenville Scrap Yard ("ESY") also is located within the Village and Town. (Id. at ¶ 1.) The New York State Department of Environmental Conservation ("DEC") is a state agency.

### 1. The Ellenville Defendants (Village)

Defendants Raymond Younger ("Mayor Younger"), Joseph Straub ("Code Officer (C.O.) Straub"), and Michael Mills ("Village Manager Mills") (collectively referred to as the "Ellenville Defendants"), were or are officials of the Village of Ellenville. Mayor Younger became a member of the Village's Board of Trustees on April 1, 1989. (Id. at ¶ 46.) He served in that capacity until April 1, 1995, when he became the Village's mayor. (Id.) He served

as mayor until April 5, 1999. (Id.). C.O. Straub was hired as the Ellenville Community Rehabilitation Specialist on May 29, 1979. He became the Village's code officer/building inspector on December 23, 1985. He continued to perform in that role until June 30, 1998. Mills became Village Manager on September 1, 1993, and continues to hold that position.

### 2. The Warwarsing Defendants (Town)

Defendants Gerald Depew ("Depew"), Joseph Stoeckler ("Supervisor Stoeckler") and John Kissell ("Code Enforcement Officer CEO Kissell") (collectively referred to as the "Warwarsing Defendants") were or are officials of the Town of Warwarsing. Depew is a former town supervisor. (Id. at ¶ 122.) Stoeckler also is a former town supervisor. (Id. at ¶ 123.) Kissell was the Town's Assistant Code Enforcement Officer from 1985 to 1991. In 1991, he became the Code Enforcement Officer. (Id. at ¶ 124.)

### 3. The State Defendants (DEC)

Defendants Marc Moran ("Moran"), Alan Fuchs ("Fuchs"), Albert Klauss ("Klauss"), and David Pollock ("Pollock") (collectively referred to as the "State Defendants") worked in the DEC's Division of Solid Waste Program. Moran was the DEC's Region 3's director. (Id. at ¶ 165.) Klauss was regional solid and hazardous waste engineer and Fuchs's immediate supervisor. (Id. at ¶ 166.) Fuchs, an environmental engineer III, was regional solid waste engineer, and Pollock's immediate supervisor. (Id. at ¶ 160 and 161.) Pollock was an environmental engineer I. (Id. at ¶ 157.)

---

1. Defendants' joint statement of material facts will be cited to only with respect to those facts that are undisputed by the parties.

## B. *History of the ESY*

In the 1980s, ESY operated an illegal solid waste management facility accepting waste tires, construction and demolition ("C & D") debris, and other solid wastes. (*Id.* at ¶ 18.) In 1987, the DEC entered into a settlement of claim with ESY's then owners, Albert and Patricia Koplik (the "Kopliks"),[2] whereby ESY acknowledged it was operating an unpermitted solid waste management facility and improperly disposed of waste. (*Id.* at ¶ 19; Koczaja Decl., Ex. 1.) The Kopliks paid a fine and agreed to close and cover the area where the C & D debris had been dumped. (*Id.*)

In December 1989, the Town's building inspector contacted the DEC to report landfill activity at the ESY. (*Id.* at ¶ 128.) The Town and the DEC began an investigation into ESY. (*Id.* at ¶ 128.) In May 1989, the Town presented its case to the Ulster County District Attorney's office, which declined to prosecute the matter. (*Id.* at ¶ 129.) On May 11, 1989, the DEC searched the ESY site and found that regulated solid waste had been dumped there. In April 1992, the DEC referred ESY to the Attorney General's Office for criminal prosecution. (*Id.* at ¶ 22.) Albert Koplik ("Koplik") was indicted on six felony counts of illegal dumping. (*Id.* at ¶ 26.) He ultimately pleaded guilty to reduced misdemeanor charges. (*Id.*) In January 1995, the DEC and ESY entered into an Order on Consent whereby, among other things, ESY was required to undertake a preliminary assessment of the site for proper remediation. (*Id.* at ¶ 28.)

In or about October 1995, Pollock, from DEC, inspected the ESY site and discovered that there had been continued dumping at the site. (*Id.* at ¶ 32.) Plaintiff Maxine Chapin ("Chapin") first complained about ESY to the Village in 1996. (*Id.* at ¶ 50.)

At that time, she informed Mayor Younger that there was mud and water on Cape Road. (*Id.*) Mayor Younger and Ellenville Police Officer Phil Mattracion met Chapin and Koplik to discuss the situation. (*Id.* at ¶ 51) On July 1, 1996, Ellenville C.O. Straub went to ESY to discuss the mud. (*Id.* at ¶ 54.) He followed up on several occasions, and on July 18, 1996, sent a notice to Koplik that the tracking of deposited soil and mud onto the pavement of Cape Road violated Part 196–1–A of the Village Laws. (*Id.* at ¶¶ 54–58.) He again followed up on the mud situation, and on August 8, 1996, issued a summons to ESY. (*Id.* at ¶¶ 59–61.) ESY pleaded guilty and paid a fine. (*Id.* at ¶ 61.) C.O. Straub continued to check on ESY throughout September 1996. (*Id.* at ¶¶ 62–64.) In January 1997, he noted that ESY was spreading shale to alleviate the mud problems. (*Id.* at ¶ 65.) He also called the Town to request that it watch that part of ESY located within the Town. (*Id.*)

In April 1997 it was observed that there had been continued dumping at the ESY. (*Id.* at ¶ 35.) In May 1997, the DEC entered into an Order on Consent with ESY's new owner, Bruno Demolition ("Bruno"), requiring Bruno to remove illegally dumped material and pay a fine. (*Id.* at ¶ 36.) On July 14, 1997, a Village meeting was held at which time plaintiff Chapin raised concern regarding odors emanating from the ESY. (*Id.* at ¶ 66.) On July 15, 1997, C.O. Straub inspected the ESY and detected a strong odor. He conferred with Village Manager Mills and CEO Kissell from the Town. (*Id.* at ¶ 67.) C.O. Straub also contacted the DEC, which stated that it would get back to him. (*Id.* at ¶ 68.) On July 17, 1997, he notified ESY that the odors emanating from the site violated Village of Ellenville Zoning Code § 227–

---

**2.** Albert Koplik is Plaintiff Chapin's cousin. (*Id.* at ¶ 9.)

15(C).[3] (*Id.* at ¶ 69.) He afforded ESY thirty days within which to remedy the situation. Also in July 1997, he spoke with Patrick Dunn ("Dunn") of the DEC's Division of Air. (*Id.* at ¶ 73.) Dunn advised C.O. Straub that the odor was a temporary problem resulting from the clean up of the site that was being conducted under DEC's consent order. (*Id.* at ¶ 73.) Dunn also advised that the odor was not a health threat. (*Id.*)

Over the next several months, Village officials monitored activity at the ESY. (*Id.* at ¶¶ 74–108.) During this time, Village officials were in contact with the DEC, the Ulster County Health Department, the Town, the New York State Office of Attorney General and Congressman Maurice Hinchey's office. (*Id.*) In February 1998, Supervisor Stoeckler for the Town, contacted the commissioner of the DEC seeking assistance with the ESY. (*Id.* at ¶ 136.) Also in February 1998, C.O. Straub issued a ticket to ESY because of the odors. (*Id.* at ¶ 83.) During this time, the plaintiffs Victoria and Roy Leland also complained to Village Manager Mills and the DEC about the ESY. (*Id.* at ¶¶ 87–88.) On February 12, 1998, Mayor Younger sent a letter to Moran of DEC requesting a full investigation of the ESY. (*Id.* at ¶ 90.) Moran responded by letter dated February 27, 1998, to Mayor Younger stating that the DEC intended to ensure that the ESY was operating in compliance with the applicable environmental laws. (*Id.* at ¶ 94.) On February 25, 1998, the DEC sent a notice of violation to Bruno stating that it was required to pay a $22,500 penalty because it failed to remove the waste from the site by September 1997, as required by the earlier consent order. On March 20, 1998, CEO Kissell inspected the

ESY. (*Id.* at ¶ 137.) ESY was issued a notice of violation. (*Id.* at ¶ 137.) On April 29, 1998, the DEC also issued a notice of violation based on a March 16, 1998 inspection. (*Id.* at ¶ 138.) On May 20, 1998, Supervisor Stoeckler wrote the DEC's commissioner concerning the continued dumping at the ESY and the lack of responsiveness from DEC employees. (*Id.* at ¶ 140.) In May or June 1998, tests were taken at ESY's and plaintiffs' property. (*Id.* at ¶ 106.) The parties dispute the test results. Defendants contend that the test results did not indicate the presence of any hazardous chemicals, and that while PCB's were found, they were not found to be at levels considered to be hazardous. (*Id.* at ¶ 106.) Plaintiffs contend that the results showed elevated levels of lead and chromium and that PCBs, tetrachloroethane, 4,4' DDE and 4,4' DDT also were detected. (Pl. Rule 7.1 stmnt. at ¶ 106.)

The DEC advised Supervisor Stoeckler that it was taking steps to close the ESY and that the Attorney General's Office was pursuing its criminal investigation. (Defs.' Rule 7.1 Stmnt at ¶ 141.) In July and August 1998, the Town reinspected ESY. (*Id.* at ¶¶ 145–46.) Thereafter, CEO Kissell, in consultation with the Town Board and Town attorney, filed an information against ESY. (*Id.* at ¶ 146.) On August 4, 1998, Village and Town officials met with the DEC to discuss the DEC's actions with respect to the ESY. (*Id.* at ¶ 108.) On August 31, 1998, Mayor Younger received a letter from DEC's Moran stating that the New York State and Ulster County Health Departments were sampling water wells. (*Id.* at ¶ 111.)

During early to mid 1998, Moran instructed his staff to make a recommendation to the DEC's general counsel in Alba-

---

**3.** Section 227–15(C) provides that "[n]o offensive odor shall be noticeable at the lot line or beyond."

ny that ESY be referred to the Attorney General's Office a second time for site closure and enforcement of the environmental laws. (*See id.* at ¶ 176.) As a result, in August 1998, a state court issued a temporary restraining order closing the ESY site and prohibiting further dumping at the site. (*Id.* at ¶ 177.) In May 1999, the temporary restraining order was converted to a preliminary injunction. (*Id.* at ¶ 178.) In August 2000, the Village sent a letter to ESY regarding work that needed to be conducted at the site. (*Id.* at ¶ 114.) The Village also sent a letter to the Ulster County Department of Health requesting that they remove the deposited tires at the ESY. (*Id.* at ¶ 115.) The Village also informed the New York Attorney General's Office that Bruno accessed ESY after it was closed, and requested that the Attorney General's Office renew its efforts to clean the property. (*Id.* at ¶ 116.) The Village wrote to the DEC requesting funding to clean the site. (*Id.* at ¶ 118.) It appears that, to date, the ESY still has not been cleaned up.

## C. *Procedural History*

Plaintiffs initially consulted with an attorney regarding ESY in 1997 or 1998. Plaintiffs did not sue ESY. (*Id.* at ¶ 193.) Instead, plaintiffs commenced the instant action by filing their Complaint on September 13, 1999. The Complaint asserts six causes of action. The *First Cause of Action* is brought pursuant to 42 U.S.C. § 1983, and alleges that the State Defendants failed to halt the illegal polluting at the ESY, and that these defendants' deliberate indifference to plaintiffs' health, welfare and property rights deprived them of their substantive due process rights in violation of the Fourteenth Amendment to the United States Constitution. The *Second and Third Causes of Action* assert similar theories of recovery as against the Warwarsing Defendants (Second Cause of

Action) and the Ellenville Defendants (Third Cause of Action). The *Fourth Cause of Action* alleges that the Village and Town failed to take proper steps to remediate the situation at the ESY, and failed to properly train their employees to adequately protect plaintiffs' health and property rights. Plaintiffs claim that these failures deprived them of their rights as protected by the Fourteenth Amendment. The *Fifth Cause of Action* claims that defendants failed to enforce the statutory and regulatory provisions of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et. seq.*, in violation of the Fourteenth Amendment. The *Sixth Cause of Action* asserts a state law claim of negligence against the Ellenville and Warwarsing Defendants.

On December 6, 1999, the State Defendants moved to dismiss pursuant to Fed. R.Civ.P. 12(b)(1) and (6). By Memorandum–Decision & Order dated April 13, 2000, this motion was denied. (Docket No. 41) On March 8, 2000, the Ellenville Defendants moved to dismiss pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6). By Memorandum—Decision & Order dated June 21, 2000, the Ellenville Defendants' motion to dismiss was granted in part and denied in part. *Leland v. Moran,* 100 F.Supp.2d 140 (N.D.N.Y.2000) Plaintiffs' claims against the Village of Ellenville Police Department were dismissed in their entirety. Plaintiffs' negligence and RCRA claims against the Ellenville Defendants also were dismissed. (*Id.* at 146–147)

As noted above, all of the defendants now move for summary judgment seeking to dismiss the Complaint in its entirety. Defendants argue that plaintiffs do not have a constitutionally protected property interest in the enforcement of the various village, town and state laws, that the individual defendants are entitled to qualified immunity, and that plaintiffs have not suf-

fered any damages. The State Defendants also argue that plaintiffs cannot seek relief for violations of the RCRA under 42 U.S.C. § 1983. Plaintiffs oppose arguing that various laws provide them with a source of constitutionally protected property interests.

## III. *STANDARD OF REVIEW*

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut,* 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

## IV. *DISCUSSION*

### A. *Issues*

Resolution of the pending motions for summary judgment requires an analysis of two primary issues: (1) whether plaintiffs have a constitutionally protected property interest in the enforcement of the Village of Ellenville Zoning Code ("VEZC"), the Town of Warwarsing's Zoning Ordinance ("TWZO"), the Town Code, and/or the New York State Constitution and Environmental Conservation Law ("ECL"); and (2) whether plaintiffs can remedy violations of the RCRA pursuant to 42 U.S.C. § 1983.

### B. *Constitutionally Protected Property Interest in Enforcement*

■ With respect to the first issue, the Second Circuit has questioned whether "a property owner ever could have a protected interest in the enforcement of the zoning laws against an adjoining property." *See Gagliardi v. Village of Pawling,* 18 F.3d 188, 192 (2d Cir.1994) (assuming, without deciding, that such a property interest could exist). Indeed, there are no Second Circuit cases finding such a right to exist. Based on Supreme Court precedent, it is unlikely that a property owner would ever have a constitutionally protected right to the enforcement of zoning ordinances. *See County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional senses.") (internal quotations and citation omitted); *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 130, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ("[T]he Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimal levels of safety and security in the workplace and the city's alleged failure to train or to warn its ... employees was not arbitrary in a constitutional sense."); *Webster v. Reproductive Health Services,* 492 U.S. 490, 491, 109

S.Ct. 3040, 106 L.Ed.2d 410 (1989) ("The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government may not deprive the individual."); *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (holding that a state had no duty to protect a child from his father after receiving reports of possible abuse) (same); *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty' ") (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325–326, 58 S.Ct. 149, 82 L.Ed. 288 (1937)); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property" (emphasis in original)). In *County of Sacramento*, the Supreme Court stated that:

> We have ... rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.... It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; *conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.*

523 U.S. at 848–49, 118 S.Ct. 1708 (emphasis added). In *DeShaney*, the Supreme Court noted that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means... [T]he Due Process Clauses generally confer no affirmative right to governmental aid." 489 U.S. at 196, 109 S.Ct. 998. Based on these holdings, the courts have overwhelmingly held that, absent the existence of some special relationship or some conduct on the part of the municipality that creates a causal relationship between the municipality and the alleged injury, municipalities have no obligation to protect private parties from the acts of other private parties. *See Robertson v. Arlington Central Sch. Dist.*, 229 F.3d 1136, 2000 WL 1370273 (2d Cir.2000) (table) (no substantive due process violations where child was harmed by a third person in school); *Star v. Burlington Police Dep't*, 189 F.3d 462, 1999 WL 710235 (2d Cir.1999) (table) (plaintiff's allegation that police department's failure to respond to complaints allowed third party to cause her harm did not state valid due process claim); *Skibinski v. Lazaroff*, 173 F.3d 846, 1999 WL 220149 (2d Cir.) (table) (government official's failure to act upon complaints is not cognizable under section 1983), *cert. denied*, 528 U.S. 867, 120 S.Ct. 165, 145 L.Ed.2d 140 (1999), *reh'g denied*, 528 U.S. 1183, 120 S.Ct. 1226, 145 L.Ed.2d 1125 (2000); *Natale v. Town of Ridgefield*, 170 F.3d 258 (2d Cir.1999); *Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818 (2d Cir.1996), *cert. denied*, 520 U.S. 1239, 117 S.Ct. 1843, 137 L.Ed.2d 1047 (1997); *Brooks v. Giuliani*, 84 F.3d 1454 (2d Cir.1996), *reh'g denied*, No. 95–

9178 (2d Cir. Aug. 7, 1996), *cert. denied,* 519 U.S. 992, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996); *Hendricks v. Bald,* No. Civ. 01–307, 2002 WL 385013, at *3 (D.N.H. Mar. 12, 2002) (due process clause imposes no obligation on municipal defendants to enforce the zoning laws); *Rosendale v. Iuliano,* No. 99 Civ. 11701, 2002 WL 215656, at *5–6 (S.D.N.Y. Feb. 13, 2002) (same), *recon. denied,* 2002 WL 2031564 (Sept. 4, 2002); *Restifo v. Magill,* No. Civ. A. 94–7347, 1995 WL 686982, at *2 (E.D.Pa. Nov. 20, 1995) (same); *see also Amos v. McHale,* 139 F.3d 887, 1998 WL 153424 (4th Cir.1998) (table) (finding no constitutionally protected rights in the enforcement of zoning laws).

▪ In the present matter, any alleged harm was not caused by the defendants, but rather, was caused by those third parties who dumped at the ESY. There are no allegations or evidence that defendants intended to deliberately harm plaintiffs. *See Collins,* 503 U.S. at 125, 112 S.Ct. 1061. Based on the record presented, defendants had no involvement in dumping at the ESY, had no special relationship with plaintiffs, and did not aid or abet those third parties in causing any alleged harm to plaintiffs. *See Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). Although defendants may not have acted in an ideal manner by quickly remedying the situation at the ESY, no fair minded trier of fact could reasonable conclude that their conduct rises to the level of "conscience shocking" necessary to find a violation of plaintiffs' substantive due process rights. *See Collins,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261; *DeShaney,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249; *Smith v. Half Hollow Hills Central Sch. Dist.,* 298 F.3d 168, 172–73 (2d Cir.2002) (teacher's actions in slapping a student without any pedagogical or disciplinary justification did not shock the conscience and did not violate student's substantive due process

rights); *Catanzaro v. Weiden,* 188 F.3d 56, 64 (2d Cir.1999); *Natale,* 170 F.3d at 262 ("Arbitrary conduct that might violate zoning regulations as a matter of state law is not ·sufficient to demonstrate conduct so outrageously arbitrary as to constitute a gross abuse of governmental authority that will offend the substantive component of the Due Process Clause."); *cf. Poe v. Leonard,* 282 F.3d 123, 139 (2d Cir.2002) (state trooper's conduct in surreptitiously videotaping a female while she undressed "qualifies as conducted intended to injure in some way unjustifiable by any governmental interest which rises to the conscience-shocking level.") (internal quotations and citation omitted); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 252 (2d Cir.2001) (holding that a gym teacher's violent physical assault of a student was sufficiently conscience-shocking to constitute a violation of the student's substantive due process right to be free of excessive force). Moreover, because there is no causal relationship between the defendants' actions (or inactions) and plaintiffs' alleged injuries, there can be no liability for a constitutional violation. *See DeShaney,* 489 U.S. at 200, 109 S.Ct. 998; *Cook v. City of Groton,* No. 97–7307, 129 F.3d 113, 1997 WL 722936 (2d Cir. Nov. 19, 1997).

Even assuming that a property owner could have a right in the enforcement of the laws against other private individuals,

[i]t is well settled in this Circuit that a constitutionally protected property interest in land use regulation arises only if there is an entitlement to the relief sought by the property owner. *See, e.g., RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911, 918 (2d Cir.), *cert. denied,* 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989). A plaintiff has a " 'legitimate claim of entitlement' " to a particular benefit if, " 'ab-

sent the alleged denial of due process, there is a certainty or a very strong likelihood that the benefit would have been granted.'" *Id.* 870 F.2d at 917 (quoting *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir.1985)). Where a local regulator has discretion with regard to the benefit at issue, there normally is no entitlement to that benefit. An entitlement to a benefit arises "only when the discretion of the issuing agency is so narrowly circumscribed" as to virtually assure conferral of the benefit. *Id.* 870 F.2d at 918; *see Brady [v. Town of Colchester*, 863 F.2d 205, 213 (2d Cir.1988) ]. The issue of whether an individual has such a property interest is a question of law.

*Gagliardi*, 18 F.3d at 192.

As a general rule, "[g]overnment officials ... are given broad discretion whether to undertake enforcement actions." *Id.; Citizens Accord, Inc. v. Town of Rochester*, No. 98–CV–0715, 2000 WL 504132, at *12 (N.D.N.Y. Apr. 18, 2000), *aff'd*, 29 Fed. Appx. 767, 2002 WL 355929 (2d Cir.2002). It is a long standing rule in New York that "the decision to enforce ... [town building and zoning] codes rests in the discretion of the public officials charged with enforcement." *Young v. Town of Huntington*, 121 A.D.2d 641, 642, 503 N.Y.S.2d 657 (2d Dep't 1986); *see also Kroll v. Village of East Hampton*, 293 A.D.2d 614, 615–16, 741 N.Y.S.2d 98 (2d Dep't 2002) (noting that enforcement of a village's zoning codes is "a discretionary act."); *Rosendale v. Iuliano*, No. 99 Civ. 11701, 2002 WL 215656 (S.D.N.Y. Feb. 13, 2002); *Mayes v. Cooper*, 283 A.D.2d 760, 761, 724 N.Y.S.2d 791 (3d Dep't 2001); *Dyno v. Village of Johnson City*, 261 A.D.2d 783, 784, 690 N.Y.S.2d 325 (3d Dep't 1999), *appeal dismissed*, 93 N.Y.2d 1033, 697 N.Y.S.2d 555, 719 N.E.2d 915 (1999), *leave denied*, 94 N.Y.2d 818, 701 N.Y.S.2d 709, 723 N.E.2d 564 (1999); *Saks v. Petosa*, 184 A.D.2d 512, 513, 584 N.Y.S.2d 321 (2d Dep't 1992); *Manuli v. Hildenbrandt*, 144 A.D.2d 789, 790, 534 N.Y.S.2d 763 (3d Dep't 1988) ("[T]he law is by now quite well settled that the decisions of local municipal officials on whether to enforce zoning codes are discretionary and not subject to judicial oversight in a civil suit or by way of mandamus.... Plaintiffs ... cannot allege that official enforcement of the zoning ordinance ... is a mandatory, rather than a discretionary, act."); *Fried v. Fox*, 49 A.D.2d 877, 878, 373 N.Y.S.2d 197 (2d Dep't 1975) ("The decision by city officials to enforce any of the myriad zoning violations existing in a given municipality must, of necessity, be left to the discretion of these officials."); *Perazzo v. Lindsay*, 30 A.D.2d 179, 290 N.Y.S.2d 971 (1st Dep't), *aff'd*, 23 N.Y.2d 764, 296 N.Y.S.2d 957, 244 N.E.2d 471 (1968); *see also Citizens Accord*, 2000 WL 504132, at *12. Thus, for this reason too, plaintiffs do not have a constitutionally protected property interest. Nonetheless, plaintiffs argue that certain provisions of the VEZC, the Town Code, the TWZO and the ECL provide a source of a constitutionally protected property interest.

### 1. *Ellenville Zoning Code*

■ Plaintiffs point to sections 227–104 and 227–15 of the VEZC to support their contention that they have a constitutionally protected property interest in the enforcement of the zoning code. Section 227–104 of the VEZC provides that "[t]his chapter shall be enforced by the Building Inspector." While this section is seemingly mandatory and obligates the building inspector to enforce every infraction of the VEZC, it merely describes the building inspector's general duty and function to enforce the zoning code. There is no indication that this provision was intended to limit the broad discretion that building inspectors in

New York generally have in enforcing zoning codes. *See Gagliardi*, 18 F.3d at 192 ("[Plaintiffs] have no right to demand that the Municipal Defendants enforce the zoning laws."). Section 227–15 delineates certain types of conduct that constitute violations of the zoning code and may be the subject of enforcement actions,[4] but contains no language to curtail the building inspector's otherwise broad discretion to enforce the zoning code and to decide what violations to prosecute and how to prosecute any such violations.

Other portions of the VEZC, which as a matter of statutory construction, must be read together with sections 227–15 and 227–104, *see United States Dep't of Energy v. Ohio*, 503 U.S. 607, 630, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992) ("It is axiomatic that a statute should be read as a whole."); *United States v. Pacheco*, 225 F.3d 148, 154–55 (2d Cir.2000), *cert. denied* 533 U.S. 904, 121 S.Ct. 2246, 150 L.Ed.2d 234 (2001); 2A N. Singer, Sutherland on Statutory Construction § 46.05 (5th ed. 1992) ("[E]ach part or section should be construed in connection with every other part or section so as to produce a harmonious

whole. Thus, it is not proper to confine interpretation to the one section to be construed."); N.Y. Statutes § 97 ("[A] statute or legislative act is to be construed as a whole."), support the conclusion that the building inspector retains discretion under the VEZC whether and how to enforce the provisions at issue here. For example, section 227–105[5] provides that the building inspector "is authorized" to inspect premises and issue a written order for the proper remedying of compliance. It does not require that he do so. Section 227–106[6] provides that the building inspector is "empowered to . . . institute any appropriate action . . . for the prevention, cessation or discontinuance" of any unlawful condition "[i]f an unlawful condition or use is found not to have been properly remedied or made to comply with the provisions of this chapter *by the expiration of a reasonable time granted by the enforcement office.*" (emphasis added). *See* VEZC §§ 227–105, 227–106. This provision obviously provides the building inspector with significant discretion. There is nothing in these sections of the code that limits the inspector's discretion. Sec-

---

**4.** Section 227–15 prohibits certain vibrations, smoke, odors, fly ash or dust, glares, liquid or solid wastes, radioactivity, noise, fire and explosives, storage, static and fumes. There is no language in 227–15 obligating the building inspector to do anything.

**5.** § 227–105. Inspections and notices of violation.

  A. The Building Inspector is authorized to enter, inspect and examine any building, structure, place, premises or use in the Village of Ellenville with regard to the provisions of this chapter and to issue a written order for the proper remedying or compliance, within a reasonable period of time, of any condition found to be in violation thereof.
  B. The police, the Fire Department Inspector and the Health Department Inspector shall, at the request of the Building Inspector or on their own initiative, exam-

ine or investigate any building, structure, use or premises with regard to any provision of this chapter and shall issue reports and recommendations to the Building Inspector regarding any violation thereof.

**6.** § 227–106. Legal action by enforcement officer.

  If an unlawful condition or use is found not to have been properly remedied or made to comply with the provisions of this chapter by the expiration of the reasonable time period granted by the enforcement officer, then the enforcement officer is empowered to immediately institute any appropriate action, charge or proceedings in the proper legal court for the prevention, cessation or discontinuance of any condition, use, occupancy or act in, on, of or around any building, structure or tract of land and for the prosecution of any owner, occupant or offender.

tions 227–105 and 227–106 do not, for example, provide that the building inspector "shall" institute an action for the prevention or discontinuance of any unlawful condition. These sections should be compared with section 227–42 wherein the VEZC explicitly states that "[u]pon a finding by the Building Inspector that any sign regulated herein is unsafe or insecure, or is a menace to the public, or has been erected in violation of the provisions of this chapter ... the Building Inspector *shall* give written notice of violation." (emphasis added). This demonstrates that the Village's legislative body knew how to mandate action by the building inspector when it so desired.[7] *See also* VEZC § 227.105(B) ("The police, the Fire Department Inspector and the Health Department Inspector *shall*" investigate upon the request of the building inspector.) (emphasis added).

Section 227–107[8] of the VEZC also appears to contemplate that the building inspector has enforcement discretion or, stated otherwise, that he or she is not obligated to pursue every violation. That provision provides that "[i]f the enforcement officer fails or refuses to proceed with any action in accordance with § 227–106 within a ten day period following written request by any taxpayer so to proceed, then any three (3) or more taxpayers ... may institute such appropriate action, charge or proceeding in like manner as such enforcement office is authorized."

This section obviously contemplates discretion in that the building inspector may refuse to act in accordance with § 227–108. If the building inspector did not have discretion whether, or how, to enforce alleged violations of the VEZC, section 227–107 would be unnecessary because the building inspector would be subject to a mandamus proceeding pursuant to Article 78 of the N.Y.C.P.L.R. An interpretation that renders § 227–107 unnecessary or of no meaningful effect is to be avoided. *Walters v. Metropolitan Educ. Enterp., Inc.,* 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) ("Statutes must be interpreted, if possible, to give each word some operative effect."); *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (noting "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (internal quotations omitted); N.Y. Statutes § 98 ("[A]ll parts of an enactment shall be harmonized with each other ... and meaning and effect given to all provisions of the statute.").

The VEZC also makes it clear that the building inspector is not the final voice on decisions regarding the Code. Article XII of the VEZC establishes a Board of Appeals that is required to "[h]ear and decide appeals from any decision, determination, act or *failure to act* of the enforcement officer and all matters properly referred to

---

7. Notably, section 227–42 also recognizes the broad discretion given to the building inspector. Under that provision, the building inspector's mandatory obligation does not arise until he has exercised his discretionary authority to determine whether the sign is unsafe, insecure, a menace to the public, or has been erected in violation of the VEZC. *See* VEZC § 227–44.

8. § 227–107. Legal action by taxpayers.
   If the enforcement officer fails or refuses to proceed with any action in accordance with

§ 227–106 within a ten-day period following written request by any taxpayer so to proceed, then any three (3) or more taxpayers of the Village of Ellenville, residing or owning property in the district wherein such condition or use in violation of this chapter exists or in an adjacent district and who are jointly or severally aggrieved by such violation, may institute such appropriate action, charge or proceeding in like manner as such enforcement officer is authorized.

it by the enforcement officer." VEZC § 227–114(A)(2) (emphasis added). The Board of Appeals is empowered to

> reverse, affirm or modify the order, requirement, decision or determination appealed from and shall make such order, requirement, decision or determination as ought to be made in the case referred to it. To that end, the Board shall have all the powers of the enforcement officer from whom the appeal is made.

VEZC § 2270114(B). The VEZC also leaves it to the Board of Appeals to "interpret any provision of this chapter about which there is uncertainty, lack of understanding or misunderstanding, ambiguity or disagreement." VEZC § 227–116. It, thus, appears that the Board of Appeals was in a position to afford plaintiffs the relief they seek. Plaintiffs could have asked the Board of Appeals to interpret the VEZC to determine whether the building inspector had discretion to enforce the terms at issue here and/or to review the building inspector's actions or inaction. Based on the record presented, it does not appear that plaintiffs availed themselves of these procedures. This further supports the conclusion that plaintiffs do not have a legitimate claim of entitlement to enforcement of the VEZC. *See Zahra v. Town of Southold,* 48 F.3d 674, 682 (2d Cir.1995). It is difficult to conceive how plaintiffs could have had such an expectation or that the Village deprived them of any such expectation until the Village had an opportunity to address these issues in accordance with the avenues of relief provided by the VEZC itself. Further, plaintiffs should not be permitted to claim a constitutional violation by short-circuiting the very procedure designed to address their concerns. *See id.*

In light of the general rule in New York that municipal officials have discretion to enforce zoning laws and because nothing in the VEZC sufficiently circumscribes the building inspector's discretion to enforce those laws, plaintiffs have no constitutionally protected property interest in their enforcement and they do not have a legitimate expectation that the Village would clean, or compel Bruno to clean, the ESY. *See Citizens Accord,* 2000 WL 504132, at *12–13.

■ Plaintiffs next contend that N.Y. Village Law § 4–400(1)(b) obligated Younger, the Village's mayor, to enforce all pertinent laws. N.Y. Village Law § 4–400(1)(b) provides that "[it] shall be the responsibility of the mayor to provide for the enforcement of all laws, local laws, rules and regulations and to cause all violations thereof to be prosecuted." On its surface, this statute appears to be mandatory and obligates village mayors to cause all violations of the laws to be prosecuted. To read this statute as imposing a mandatory, non-discretionary duty upon a village mayor to cause all violations of all laws within his or her jurisdiction to be prosecuted would, however, lead to absurd results. *See* N.Y. Statutes § 145 ("A construction which would make a statute absurd, or lead to absurd results, should be avoided; and the court should adopt a construction which avoids absurdity, or absurd consequences.").

First, it would go against the settled principle in New York that, absent some constitutional mandate, public officials have discretion whether to enforce statutes. *Gaynor v. Rockefeller,* 15 N.Y.2d 120, 131, 256 N.Y.S.2d 584, 204 N.E.2d 627; *Perazzo,* 30 A.D.2d at 180, 290 N.Y.S.2d 971; *see also* N.Y. Statutes § 153 ("The courts will presume that a ... change in the common law by statute will be expressed with the clearness which the importance of the subject demands, or so that its meaning is unmistakable, especially when the change affects ... rules of

liability."). The obligation to enforce the laws is not simply a ministerial act. "A ministerial act ... has been defined as a specific act which the law requires a public officer to do in a specified way on conceded facts without regard to his own judgment." *Posner v. Levitt,* 37 A.D.2d 331, 332, 325 N.Y.S.2d 519 (3d Dep't 1971). Whether a particular statute has been violated depends on the specific facts and circumstances and, thus, necessarily involves the exercise of judgment and discretion. Moreover, no municipality has the resources necessary to prosecute each and every violation of the law and the executive must, therefore, exercise his or her discretion in determining how to allocate those finite resources. *See Kerness v. Berle,* 85 A.D.2d 695, 696, 445 N.Y.S.2d 484 (2d Dept' 1981), *aff'd,* 57 N.Y.2d 1042, 457 N.Y.S.2d 786, 444 N.E.2d 36 (1982). Thus, unlike a village mayor's obligation to sign a contract that has been approved by the board of trustees, which is purely ministerial, *see* N.Y. Village Law §§ 4–400(1)(i); 4–412; *Karedes v. Colella,* 292 A.D.2d 138, 141, 740 N.Y.S.2d 526 (3d Dep't 2002), *leave to appeal granted,* 740 N.Y.S.2d 526 (3d Dep't 2002), the duty to enforce the laws, and how to go about enforcing those laws, involves discretion.

Second, it would make the mayor and/or village liable for the building inspector's failure to enforce the zoning code in situations where, as here, the building inspector is under no obligation to enforce the zoning code. *See* discussion *supra.* Third, it similarly would make the mayor and/or village liable for the prosecutor's decision not to prosecute a particular case, whereas prosecutors have substantial discretion whether to prosecute a particular case. *See United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ("[T]he decision whether or not to prosecute ... generally rests entirely in [the prosecutor's] discretion."); *United States v. Mishoe,* 241 F.3d 214, 220–21 (2d Cir.2001); *People v. Hall,* 291 A.D.2d 143, 146, 738 N.Y.S.2d 782 (4th Dep't), *leave denied,* 98 N.Y.2d 651, 745 N.Y.S.2d 510, 772 N.E.2d 613 (2002); *Nieblas v. Kings County District Attorney,* 209 A.D.2d 703, 619 N.Y.S.2d 675 (2d Dep't 1994).

Fourth, it would improperly draw courts into becoming "super-mayors" or "super-prosecutors." *See Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 58 (2d Cir.1985); *Restifo,* 1995 WL 686982, at *2. Citizens of any village could commence actions in court pursuant to 42 U.S.C. § 1983 for any alleged violation of a state or local law, however trivial the violation may be, and require the court to review the citizen's complaint to ascertain whether there has been a violation of the law and, thus, whether the mayor was obligated to prosecute the violation. *See Zahra,* 48 F.3d at 682 ("[E]ven an outright violation of state law in the denial of a license will not necessarily provide the basis for a federal claim, at least when the applicant has a state law remedy. Otherwise every disappointed applicant, even though the state provided reasonably adequate redress, could invoke federal jurisdiction on the claim that the state administrative body acted arbitrarily in violation of his federal due process rights. To permit an influx of such cases into federal courts would violate principles of federalism, promote forum-shopping, and lead to unnecessary state-federal conflict with respect to governing principles in an area principally of state concern."); *Restifo,* 1995 WL 686982, at *2 ("Finding such an entitlement would allow individual residents to lodge constitutional challenges in federal court anytime they are unhappy with a proposed building or activity. Indeed, any municipal act or failure to act would give rise to a constitutional interest, and the federal courts would be inundated with challenges to local ac-

tions."); *Wooters v. Jornlin,* 477 F.Supp. 1140, 1146 (D.De.1979) ("This Court would certainly hesitate to find that the Delaware General Assembly intended to make the strict enforcement of the county building code mandatory in every respect.... Any requirement of strict enforcement could have many undesirable side-effects."), *aff'd,* 622 F.2d 580 (3d Cir.), *cert. denied,* 449 U.S. 992, 101 S.Ct. 528, 66 L.Ed.2d 289 (1980); *People v. Ballard,* 134 N.Y. 269, 293, 32 N.E. 54 (1892); *see also Jones v. Beame,* 45 N.Y.2d 402, 409, 408 N.Y.S.2d 449, 380 N.E.2d 277 (1978) ("One may initiate a criminal complaint against a malefactor for a particular act, or administratively charge a police officer for failing to do his duty to arrest and charge, but rarely, if ever, should mandamus lie to command the Commissioner of Public Safety to enforce the Sunday 'blue' laws or the ordinance forbidding the riding of bicycles on the sidewalk.") (quoting *People ex rel. Clapp v. Listman,* 40 Misc. 372, 374–76, 82 N.Y.S. 263 (1903), *aff'd,* 84 A.D. 633, 82 N.Y.S. 784 (4th Dep't 1903)). This kind of oversight of the executive is not the function of the courts. *See Yale Auto Parts, Inc.,* 758 F.2d at 58. Thus, Mayor Younger retained broad discretion how to enforce the laws and Village Law § 4–400(1)(b) does not give plaintiffs a constitutionally protected property interest in the enforcement of the VEZC or any other law.

In any event, the Village did not simply ignore the situation at the ESY. Village officials repeatedly checked on the ESY; conferred with the Kopliks, Bruno, the DEC, the Town, Congressman Hinchey, the Ulster County Department of Health, the New York State Attorney General's Office, and plaintiffs to resolve concerns about the ESY; issued a summons to which ESY pleaded guilty and paid a nominal fine; served ESY with notices of violation of the VEZC and Village laws; and issued tickets to ESY. Thus, they fulfilled any duties imposed by the VEZC.

### 2. *Town of Warwarsing Zoning Ordinance and/or Town Code*

Similar to the previous discussion, there is nothing in the TWZO, the Town Code or elsewhere that gives plaintiffs a constitutionally protected property interest in the enforcement of the laws. TWZO section 402 provides that it "shall be enforced by the Code Enforcement Officer, in accordance with the provisions of this Ordinance." Again, such language merely sets forth the code enforcement officer's general duties. The mandatory portion of section 402 ("shall be enforced") is qualified by the phrase "in accordance with the provisions of this Ordinance." The other provisions of the TWZO provide for discretionary enforcement. Section 432 provides that "[t]he Code Enforcement Officer *may* institute an injunction, mandamus, abatement or any other appropriate action to prevent, enjoin, abate, or remove" violations of the TWZO (emphasis added). This language unquestionably is permissive, thereby evidencing that the enforcement officer has discretion whether and how to prosecute violations of the TWZO. *See Citizens Accord,* 2000 WL 504132 at *12–13. In any event, the code enforcement officer did serve a notice of violation on ESY and followed that up by filing an information against ESY, thereby fulfilling any duties he had under the TWZO. *See* TWZO § 432.[9]

---

9. Incidentally, section 432 provides property owners with the same rights as the CEO to enforce the zoning ordinance. Thus, plaintiffs had ample opportunity to ensure the enforcement of the zoning ordinance if they were displeased with the Town's efforts. Plaintiffs did not avail themselves of this opportunity. In light of plaintiffs' own inaction

■ With respect to alleged violations of the Town's junkyard and/or landfill operations laws, Chapters 72 and 74 of the Town Code respectively, sections 72–17(c) and 74–14(D) provide that "[i]n addition to the above-provided penalties and punishment, the Town Board *may* also maintain an action or proceeding in the name of the town . . . to compel compliance with or to restrain by injunction the violation of such chapter." Again, this is plainly discretionary language that is insufficient to confer upon plaintiffs a constitutionally protected property interest in the enforcement of the

Town Code. *See Citizens Accord,* 2000 WL 504132 at *12–13.

### 3. *New York State Constitution and Environmental Conservation Law*

Plaintiffs next contend that they have a constitutionally protected property interest in the enforcement of the state's environmental laws. In support of this argument, plaintiffs point to Art. 14, sec. 4 of the New York State Constitution,[10] and sections 3–0301,[11] 17–0103,[12] 17–1401,[13] 27–0301,[14] and 71–0201 [15] of the ECL. While the cited

---

to protect their property, it is difficult to conceive how the Town's failure to do more constitutes a constitutional violation.

10. This provision provides that

The policy of the state shall be to conserve and protect its natural resources and scenic beauty and encourage the development and improvement of its agricultural lands for the production of food and other agricultural products. The legislature, in implementing this policy, shall include adequate provision for the abatement of air and water pollution and of excessive and unnecessary noise, the protection of agricultural lands, wetlands and shorelines, and the development and regulation of water resources. The legislature shall further provide for the acquisition of lands and waters, including improvements thereon and any interest therein, outside the forest preserve counties, and the dedication of properties so acquired or now owned, which because of their natural beauty, wilderness character, or geological, ecological or historical significance, shall be preserved and administered for the use and enjoyment of the people. Properties so dedicated shall constitute the state nature and historical preserve and they shall not be taken or otherwise disposed of except by law enacted by two successive regular sessions of the legislature.

11. This provisions provides, in part, that

It shall be the responsibility of the department [of environmental conservation], in accordance with such existing provisions and limitations as may elsewhere be set forth in law, by and through the commis-

sioner, to carry out the environmental policy of this state set forth in section 1–0101 of this chapter. In so doing, the commissioner shall have power to: . . .
i. Provide for prevention and abatement of all water, land and air pollution, including but not limited to that related to particulates, gases, dust, vapors, noise, radiation, odor, nutrients and heated liquids.

12. This provision reads as follows:

It is the purpose of this article to safeguard the waters of the state from pollution by preventing any new pollution and abating pollution existing when the predecessor of this chapter was enacted, under a program consistent with the declaration of policy stated in section 17–0101.

13. "It is the purpose of this title to safeguard the waters of the state from nonpoint source pollution by controlling and abating new and existing sources of nonpoint source pollution."

14. "It is declared to be the intent and purpose of this title to protect the environment from mishandling and mismanagement of all regulated wastes transported from the site of generation to the site of ultimate treatment, storage or disposal and to prevent a discharge of wastes into the environment, whether accidental or intentional, except at a site approved for the treatment, storage or disposal of such wastes."

15. That section provides that "[e]very police officer and any employee of the department as may be designated by the commissioner, shall enforce the provisions of this chapter,

constitutional provision and statutes undoubtedly set forth the state's commitment to the environment and it would be desirable for the DEC to eradicate all pollution from the land, air and waters, none of the provisions cited by plaintiffs impose an obligation upon the DEC or its agents to investigate and remediate every possible violation of the ECL.

■ Article 14, section 4 of the New York State Constitution requires the legislature to include adequate provision for the abatement of various types of pollution. It has done so by enacting the ECL. Nothing in the language of this constitutional provision sufficiently restricts the DEC's discretion in enforcing the ECL such that it provides plaintiffs with a source of a constitutionally protected property right. To the contrary, N.Y. Const. art. 125, § 5 provides that "[a] violation of any of the provisions of this article *may* be restrained at the suit of the people or, with the consent of the supreme court in appellate division, on notice to the attorney-general at the suit of any citizen." (emphasis added). This permissive language dispels any argument that the DEC, or any other agent of the state, has no discretion whether to enforce Article 14 of the New York State Constitution.

■ Section 3–0301 of the ECL lists various "powers" of the commissioner of the DEC. For example, that section provides that "the commissioner shall have the power to ... [p]rovide for the abatement of all water, land and air pollution." This section does not constrain the DEC's discretion whether to enforce or prosecute violations of the ECL, but merely provides the DEC with a grant of authority to abate pollution.

Sections 17–0103 and 17–1401 set forth the underlying purposes of Titles 1 and 14

and the rules, and regulations and orders

respectively of Article 17 of the ECL. *See Binghamton–Johnson City Joint Sewage Bd. v. N.Y. State Dep't of Envtl. Conserv.*, 159 A.D.2d 887, 888, 553 N.Y.S.2d 523 (3d Dep't 1990); *City of New York v. N.Y. State Dep't of Envtl. Conserv.*, 108 Misc.2d 170, 173, 437 N.Y.S.2d 246 (1981), *aff'd*, 89 A.D.2d 274, 456 N.Y.S.2d 462 (3d Dep't 1982). Section 27–0301 similarly sets forth the "intent and purpose" of title 3 of Article 27 of the ECL. These provisions lack anything restricting the DEC's discretion to enforce the environmental laws or obligating it to enforce each and every potential violation. Thus, they do not provide a source of a constitutionally protected property interest.

■ Although section 71–0201 seemingly speaks in mandatory terms, as noted, it is well-settled law in New York that absent the clear violation of a constitutional mandate, public officials have discretion whether to enforce state statutes. *See Perazzo*, 30 A.D.2d at 180, 290 N.Y.S.2d 971 (holding that city mayor and police commissioner have discretion whether to enforce the New York State Penal Code or New York City Administrative Code); *see also Star*, 189 F.3d 462, 1999 WL 710235. This is supported by New York case law which has held that DEC retains discretion whether to enforce Article 17 of the ECL, and more generally, that public officials have discretion how to carry out their duties to enforce the laws. In *Kerness*, the Second Department stated that:

> Concededly there are statutory duties vested in the respective commissioners to administer both the law and rules and regulations relating to the discharge of waste into ground waters, and the issuance of permits allowing such actions subject to conditions and limitations imposed by the issuing department (see

enacted or promulgated thereunder."

ECL art 17; 6 NYCRR 654.1—655.6, 658.1–659.19, 700.1—700.2, 702.1—704.6, 750.1—750.3, 751.1—751.3, 752.1—752.6, 753.1—753.8, 754.1—754.4, 755.1—755.2, 757.1—757.2). However, involved in the exercise of such duties are questions of judgment, discretion and the allocation of the resources and priorities which are inappropriate for resolution in the judicial arena (*see Jones v. Beame*, 45 N.Y.2d 402, 407, 408 N.Y.S.2d 449, 380 N.E.2d 277 [ (1978) ] ). The acts which petitioner ... seeks to compel the commissioners to perform ... involve the exercise of a great deal of day-to-day judgment and discretion which would be impossible for the courts to oversee (*see James v. Board of Educ.*, 42 N.Y.2d 357, 368, 397 N.Y.S.2d 934, 366 N.E.2d 1291 [ (1977) ]; *Jones v. Beame, supra*, p. 407, 408 N.Y.S.2d 449, 380 N.E.2d 277).

*See also Bullion v. Safir*, 249 A.D.2d 386, 670 N.Y.S.2d 366 (2d Dep't 1998) (holding that the petitioner failed to demonstrate a clear legal right to compel the police to arrest a certain individual); *Grzyb v. Constantine*, 182 A.D.2d 942, 944, 582 N.Y.S.2d 298 (3d Dep't 1992) ("[M]andamus will not lie to compel respondents to perform their duty to investigate in a certain manner. The extraordinary remedy will lie only to compel the performance of a purely ministerial act and may not be used to compel an act as to which respondents may exercise judgment or discretion."); *Young*, 121 A.D.2d at 642, 503 N.Y.S.2d 657 ("Regardless of whether certain of the conditions said to be existing at the garage may violate the zoning or building provision of the town code, the decision to enforce those codes rests in the discretion of the public officials charged with enforcement."); *New York State Conservation Council v. Diamond*, 74 Misc.2d 513, 345 N.Y.S.2d 291 (1973) (holding that section 9–0301 and 9–0105 of the ECL, which sets forth certain duties of the DEC, do not create a mandatory duty upon the DEC); *Tobin v. Ingraham*, 67 Misc.2d 990, 993, 326 N.Y.S.2d 51 (1971) ("While it may be stated that the duty to enforce the law and code gives no freedom of choice to the Health Commissioner, the ensuing action as a consequence of this responsibility is discretionary and requires the exercise of judgment or skill based upon the total facts and conditions as they appear." (internal quotations and citation omitted)). Even assuming the DEC and its employees have a duty to enforce the ECL, they have discretion how to enforce the ECL. *See Klostermann v. Cuomo*, 61 N.Y.2d 525, 540, 475 N.Y.S.2d 247, 463 N.E.2d 588 ("The general principle is that mandamus will lie against an administrative officer only to compel him to perform a legal duty, and not to direct how he shall perform that duty.") (internal alternation, quotations and citation omitted). Here too, whether and how to enforce the ECL involves a great deal of discretion, and plaintiffs do not have a constitutionally protected property interest in the enforcement of these laws.

In any event, it is evident from the record presented that the DEC has been working on the ESY site since at least 1987. At that time, the DEC entered into a consent order with the Kopliks whereby they agreed to close and cover the ESY. Upon learning that the Kopliks did not comply with the consent order, in 1989 the Town and the DEC presented the matter to the Ulster County District Attorney's Office. That office declined to prosecute. In 1992, the DEC referred the ESY to the Attorney General's Office, which did prosecute the matter. This resulted in convictions. Upon learning that there were continued problems at the ESY, in 1997, the DEC entered into a consent order with Bruno in which it agreed to remove the debris from the ESY. When the DEC dis-

covered that Bruno failed to remove the debris, it sent two notices of violation. The DEC pursued the matter and obtained a preliminary injunction closing the ESY and prohibiting further dumping at the site. It is, thus, clear that the DEC did not sit by and do nothing with respect to the ESY. By taking the above actions, the DEC has fulfilled any duty imposed upon it to enforce the ECL. Plaintiffs point to no further obligation on the part of the DEC itself to clean up the ESY and remove the contamination from plaintiffs' property as is requested in the Complaint. Accordingly, plaintiffs have failed to identify the source of any legitimate expectation in the relief requested, and therefore, do not have a constitutionally protected property interest.

### 4. *Failure to Train*

Plaintiffs also allege that the two municipalities should be liable for their failure to properly train the individual defendants how to properly respond to and alleviate plaintiffs' environmental concerns. The violation, or likely violation, of a clearly established federal right is a "prerequisite for municipal liability under a failure to train theory." *Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 166 (2d Cir. 2002). Because, as discussed, plaintiffs have failed to demonstrate the violation or likely violation of a clearly established federal right, the municipal defendants cannot be held liable under a failure to train theory. *Id; see Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir.2001); *Townes v. City of New York*, 176 F.3d 138, 143–44 (2d Cir.), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 311 (1999).

### C. *Resource Conservation and Recovery Act*

The state defendants seek to dismiss plaintiffs' RCRA cause of action against them on the ground that RCRA may not be enforced via 42 U.S.C. § 1983.[16] Plaintiff opposes contending that RCRA's "savings clause" and the Supreme Court's decision in *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), preserve a right of action under § 1983.

The First Circuit is the only court of appeals to have addressed whether the RCRA may be enforced via section 1983. *See Garcia v. Cecos Int'l, Inc.*, 761 F.2d 76 (1st Cir.1985). The *Garcia* court found that RCRA entails "numerous and elaborate statutory provisions relating to enforcement" that are similar to those discussed by the Supreme Court in *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and therefore are "sufficiently comprehensive to preclude a cause of action under section 1983." *Garcia*, 761 F.2d at 83.

The reasoning in *Garcia* is persuasive and is supported by Supreme Court precedent. "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Sea Clammers*, 453 U.S. at 14–15, 101 S.Ct. 2615. Unlike the situation in *Franklin*, RCRA contains numerous explicit remedies, including civil and criminal penalties that may be enforced by the federal government, 42 U.S.C. § 6928, administrative enforcement actions, 42 U.S.C. § 6961(b), and a private cause of action, 42 U.S.C. § 6972. *See Franklin*, 503 U.S. at 69 n. 6, 112 S.Ct. 1028. The Supreme Court itself has characterized RCRA as consisting of elaborate enforcement provisions for remedying the violation of a federal statute. *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 487–88, 116

---

**16.** Plaintiff voluntarily discontinued the RCRA claims against all other defendants.

S.Ct. 1251, 134 L.Ed.2d 121 (1996). "As we explained in ... *Sea Clammers* ... where Congress has provided 'elaborate enforcement provisions' for remedying the violation of a federal statute, as Congress has done with RCRA ..., 'it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under' the statute." *Id.* (quoting *Sea Clammers*, 453 U.S. at 14–15, 101 S.Ct. 2615). Thus, "the RCRA statutory scheme is sufficiently comprehensive to preclude a cause of action under section 1983." *Garcia*, 761 F.2d at 83.

Plaintiffs' "savings clause" argument was rejected by the Supreme Court in *Sea Clammers* and must similarly be rejected here. The *Sea Clammers* Court stated that:

> the language of the saving clause ... is quite ambiguous concerning the intent of Congress to "preserve" remedies under the [RCRA] itself. It merely states that nothing in the citizen-suit provision "shall restrict any right which any person ... may have under any statute or common law to seek enforcement of any [standard of requirement relating to the management of solid waste or hazardous waste,] ... or to seek any other relief." It is doubtful that the phrase "any statute" includes the very statute in which this statement was contained.

453 U.S. at 15–16, 101 S.Ct. 2615.[17] Thus, there is no indication that the savings clause was intended to provide plaintiffs with another mechanism (*i.e.* 42 U.S.C. § 1983) to enforce RCRA. Accordingly, plaintiffs' claim under RCRA must be dismissed.

### D. *Negligence*

The state law claim of negligence against the Warwarsing defendants must be dismissed for the reasons set forth in *Leland vs. Moran*, 100 F.Supp.2d at 146–147 as applied to the Ellenville defendants.

### E. *Qualified Immunity and Damages*

In view of the above, the defenses of qualified immunity and lack of damages need not be discussed.

## V. *CONCLUSION*

Plaintiffs do not have a constitutionally protected property interest in the enforcement of the VEZC, TWZO, Town Code or ECL against an adjoining landowner. The Ellenville Defendants retain discretion how to enforce their zoning code. The Warwarsing Defendants similarly have discretion how to enforce their zoning ordinance and town code. The DEC and its officials and agents also have discretion how to enforce the ECL. Accordingly, none of these laws give plaintiffs a constitutionally protected property interest in the enforcement of such laws. As such, the municipal defendants cannot be liable for failure to train. RCRA's comprehensive statutory scheme precludes a cause of action under 42 U.S.C. § 1983. With no special duty to the plaintiffs to enforce the zoning ordinance and/or town code, the Warwarsing defendants are not liable in negligence.

Accordingly, it is

Ordered that:

1. The Ellenville Defendants' motion for summary judgment is GRANTED;

2. The Warwarsing Defendants' motion for summary judgment is GRANTED;

3. The State Defendants' motion for summary judgment is GRANTED; and

4. Plaintiffs' Complaint is DISMISSED in its entirety.

---

17. The savings clause discussed in *Sea Clammers* is virtually identical to that in RCRA.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.